| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Case No. 3:14-cr-0069** |
| v. | ) | **Judge Aleta A. Trauger** |
| | ) | |
| JUSTIN FIFE, | ) | |
| | ) | |
| Defendant, | ) | |

## MEMORANDUM

The defendant has filed a Motion to Suppress Warrantless Search (Docket No. 18), to

which the government has filed a Response in opposition (Docket No. 24) and a Supplement to

the Response in opposition (Docket No. 25).  The plaintiff has also filed an Amended Motion to

Suppress (Docket No. 34), to which the government has filed a Response in opposition (Docket

No. 38).  On March 25, 2015, the court held an evidentiary hearing on the defendant's motions

(*see* Docket Nos. 44, 45, and 47).  Following the hearing, the defendant filed a Supplemental

Memorandum in support of both motions (Docket No. 48), the government filed a Supplemental

Response in opposition (Docket No. 51), and the defendant filed a Reply (Docket No. 52).  For

the reasons stated herein, the motion will be denied.

## BACKGROUND

### I.  Overview

On November 28, 2012, officers of the Clarksville Police Department (the "CPD") in

Montgomery County, Tennessee responded to a 911 call at Fife's Clarksville residence related to

a dispute between Fife and a woman named Courtney Jones.  At the scene, Fife accused Jones of

breaking a window and attempting to burglarize his home, whereas Jones accused Fife of

drawing a gun on her and threatening to shoot her.  As of the date of the incident, Fife was a

convicted felon, and he was on probation for aggravated burglary and aggravated assault stemming from a guilty plea in a Tennessee Circuit Court. After the chain of events detailed herein, the CPD, seeking to investigate whether Fife in fact possessed a weapon used in an aggravated assault on Jones, obtained written consent from Fife to search his residence. Without obtaining a warrant, officers searched the residence and discovered two weapons and associated ammunition for one of the weapons.

The arrest caused three sets of legal problems for Fife. First, the State of Tennessee charged Fife with aggravated assault and being a felon in possession, both felonies. Second, the State charged Fife with violating his existing probation terms. Third, because federal law also forbids felons from possessing firearms and ammunition, on April 9, 2014, the federal government charged Fife with knowingly possessing a firearm (Count I) and knowingly possessing ammunition (Count II). *See* 18 U.S.C. §§ 922(g)(1) and 924.

## II. <u>Tennessee State Court Proceedings</u>

In Tennessee Circuit Court, Fife moved to suppress the evidence against him, which was obtained pursuant to a warrantless search. The prosecutor dropped the state's criminal charges but proceeded on the probation violation, after which the Circuit Court held a hearing on both the motion to suppress and the probation violation.[1] The record contains a transcript of the Circuit Court hearing on August 27 and 28, 2014, at which Fife, Jones, CPD Officer Christopher Cunningham, and CPD Officer Raymon Carroll testified. (*See* Docket No. 25, Ex. 1.) In substance, (1) Jones sought to suppress the evidence against him on the grounds that,

---

[1] It appears that the parties proceeded with the motion to suppress under the assumption that, if the evidence were suppressed, it could not be admitted to establish a probation violation. However, on appeal, the Tennessee Court of Appeals indicated that Tennessee does not apply the exclusionary rule in probation revocation proceedings in certain circumstances.

notwithstanding his signature on the permission to search form, he did not voluntarily give consent, and (2) even if the evidence was not suppressed, the prosecution had not proven that Jones in fact possessed the weapons or the ammunition.

At the hearing, the Circuit Court recounted Fife's history related to the crime for which he was serving probation. On January 25, 2010, Fife had pleaded guilty to a charge of "especially aggravated burglary," for which he received an eight-year suspended sentence and was placed on probation.[2] On April 26, 2010, just three months into his probation, Fife was accused of committing several new crimes, including driving on a revoked license, reckless endangerment, and domestic assault. Fife was also charged with violating his probation by failing to report his arrest. After a hearing on September 9, 2010, the Circuit Court found Fife in violation of his probation and sentenced him to time served. On February 22, 2012, Fife was accused of another domestic assault, driving on a revoked license, and criminal impersonation, as well as failing to report to his probation officer for the entirety of 2011. After Fife admitted on May 8, 2012 that he violated his probation, the Circuit Court again sentenced him to time served and reinstated his probation. Thus, the alleged crimes related to the November 28, 2012 incident with Jones reflected the third time in fewer than three years that Jones had been accused of committing felonies (each of which included charges of domestic assault) that also violated his probation terms.

At the hearing, the prosecution played recorded jail calls from Fife to outsiders, in which Fife was overheard making statements to his wife to the effect that he could "beat this" (meaning the charges) by having someone else claim ownership of his gun. Fife testified that he made

---

[2] Fife also pleaded guilty to a charge of aggravated assault, for which he received a six-year suspended sentence and was placed on probation. *See State of Tennessee v. Fife*, No. M2013-02211-CCA-R3-CD, 2014 WL 2902276, at *1 (Tenn. Ct. App. June 26, 2014).

these statements only to curry favor with his angry wife, who was questioning why Jones had come to Fife's residence.

At the conclusion of the August 28, 2012 hearing, the Circuit Court ruled from the bench, finding that: (1) Fife "freely and voluntarily" consented to the search of his residence and there was no evidence that the consent form was procured through coercion, duress, unfulfilled promises, or threats; and (2) even if he did not own the weapon that the police recovered from his bedroom, Fife constructively possessed the weapon. With respect to Fife's explanation about his jail phone calls, the Circuit Court found his testimony to be untrue. The Circuit Court accordingly found that Fife had violated his probation and ordered him to complete the unsatisfied portion of his eight-year sentence.

Fife appealed. On June 26, 2014, the Tennessee Court of Appeals affirmed the Circuit Court, finding that: (1) the evidence "did not preponderate" against the Circuit Court's finding that Fife voluntarily consented to the search; (2) even if Fife did not voluntarily consent for purposes of the exclusionary rule, the exclusionary rule does not apply in Tennessee probation revocation proceedings unless the evidence is obtained from police harassment or in a particularly offensive manner, which was not the case relative to Fife; and (3) the evidence indicated that Fife constructively possessed the pistol. *See State of Tennessee v. Fife*, No. M2013-02211-CCA-R3-CD, 2014 WL 2902276 (Tenn. Ct. App. June 26, 2014) [docketed in this case at Docket No. 25, Ex. 2].[3]

### III. Federal Proceedings

---

[3] The federal grand jury returned the Indictment in this case on April 9, 2014, while Fife's appeal from the Tennessee Circuit Court was pending.

Here, Fife has filed a Motion to Suppress and an Amended Motion to Suppress the evidence against him relative to the federal Indictment. In his Motion to Suppress, he asserts that his written consent to search the residence was not valid or voluntary, primarily because the consent was obtained through coercion. In his Amended Motion to Suppress, Fife asserts additional grounds for suppression, contending that (1) the police did not have a right to enter his home or to request to search his home because Jones provided an "unreliable and unconfirmed tip;" (2) the police did not have a right to enter Fife's home or to request a search of his home because the responding officer's initial pat down of Fife (which took place outside of the residence) revealed no weapons on his person; (3) this court should find that the right to counsel extends to requests to search (*i.e.*, that individuals asked consent to a search must be *Mirandized* before they provide consent); (4) the police detained Fife inside his residence without cause; and (5) the police unlawfully questioned Fife as to which bedroom was his before searching that bedroom.

Both parties agree that this court is not bound by the findings of the Tennessee Circuit Court or the Tennessee Court of Appeals, although the government argues that the state court decisions provide persuasive authority.

## IV. Factual Background Based on Evidence Introduced at the Evidentiary Hearing[4]

### A. Fife's Background

---

[4] Officer Nesbitt initially provided confusing testimony concerning his observations of the incident. Through questioning by the court and by the government, it became clear that Officer Nesbitt did not recall details concerning the event with any clarity, that his role in the chain of events was limited, and that he was not privy to the ten-minute unrecorded discussion among Fife, Carroll, and Lane in Fife's kitchen. Neither party has relied on Officer Nesbitt's testimony to any significant degree, and neither will the court.

On the date of the incident, Fife was 29 years old.  According to a criminal history printout in the record, Fife had been the subject of at least 23 encounters with law enforcement in multiple states, including four that culminated in felony convictions.  The felony convictions were as follows: (1) pleading guilty on January 25, 2010 in Tennessee Circuit Court to especially aggravated burglary and aggravated assault; (2) pleading guilty in 2003 in Ohio state court to burglary; and (3) pleading guilty in August 2003 in Michigan state court to larceny.

As to Fife's education, he obtained a Graduate Equivalency Degree and applied to attend Owens Community College in Toledo, Ohio in 2005.  He was admitted to the college in January 2006, enrolled in several mechanical engineering courses, and failed all three.

## B.  The Incident at Issue[5]

### 1.  Initial Response, Pat Down, and Consensual Discussion with Walker

At approximately 6:07 p.m., Fife called 911 to report that he needed an officer to respond because a window had been broken and an individual was refusing to leave his residence.  Fife and an individual referenced as "Courtney" (later identified as Courtney Jones) could be heard arguing.

Officer Chris Cunningham of the CPD was dispatched to Fife's residence in response to the 911 call.[6]  At the time he responded, Officer Cunningham was equipped with a microphone

---

[5] The court's summary of the incident is based on the testimony in the record, including hearing testimony, a testimonial affidavit from Fife, and exhibits introduced into evidence.  As explained in this section, the Fife Affidavit is not credible and, therefore, has been given little weight.  The court also notes that, at the outset of the hearing, the court denied the defendant's Motion to Strike Jones' written statement (Docket No. 43), which the government had attached to its Supplemental Response to the Motion to Suppress (*see* Docket No. 25, Attach. No. 2).  The court admitted the statement as Government's Exhibit 3 for the limited purpose of its effect on Officer Cunningham at the time.  As a housekeeping measure, the court will direct the clerk to term the Motion to Strike.

that recorded audio of much (but not all) of what transpired that night, a CD disk of which is in evidence (Suppression Hearing, Govt. Ex. 2). When he approached the house, Cunningham encountered both Fife and Jones standing on the front porch of the house and arguing with each other. In a polite demeanor, Cunningham questioned the two about what had happened. Jones claimed that she had lived with Fife at the house until the night before, when Fife threw her out of the house "by her f*cking hair," "ripped" her clothes, and "pulled a gun in my goddam face," an accusation that she repeated. She claimed that some of her property was still inside the house. Fife denied that he had pulled a gun on Jones, complained that Jones had broken his window without justification while attempting to burglarize his home, and stated that he did not have any property of Jones' inside.

Officer Cunningham asked for permission to pat down Fife, which Fife granted. During the pat down, Fife and Jones continued to argue, and Jones repeated the accusation that Fife had pulled a gun in her face. Officer Cunningham did not find any weapons on Fife during the pat down. Officer Cunningham asked whether anyone else was inside the house, and Fife explained that he had a roommate named Jay Walker. Cunningham asked for permission to speak with Walker, to which Fife consented. Cunningham asked Fife and Jones to remain calm while he questioned Walker about the situation. Because the front door was locked, Cunningham knocked on the door. Walker answered the door, Cunningham identified himself and asked for permission to speak with him, and Walker gave permission. Cunningham did not see any weapons on Walker or see any weapons in plain view from where he was standing. Walker let Officer Cunningham inside.

---

[6] Officer Nesbitt and an "Officer Smock" also assisted Cunningham at the scene. The record contains no discussion of Officer Smock's role, if any.

Walker recounted that he had arrived home only about 20-30 minutes before the incident, when he heard Fife and Jones arguing (apparently inside the house), heard Fife tell Jones to leave, saw Jones refuse to leave, and saw Fife "herd" Jones out of the door by blocking her way back inside and ushering her out of the house.  Walker heard Jones "throw a fit" about retrieving her belongings from Fife.  Walker stated that he did not observe a physical altercation, that neither he nor Fife owned any weapons, that Walker was "not aware of" any weapons in the house other than a "pocket knife," and that he had never known Fife to own a gun.

  2. <u>Limited Consensual Search</u>

Cunningham beckoned to Fife to come back into the house.  Cunningham asked Fife whether he had any weapons; Fife said he did not.  When Cunningham asked whether Fife would "mind" if Cunningham went "looking around to make sure there isn't anyone in here," Fife initially consented.  When Cunningham qualified that he meant whether he could search for weapons, Fife responded that Cunningham would need to have a search warrant.  Cunningham said "OK" and immediately went back outside the house with Fife and Walker.

Apparently changing his mind, Fife told Cunningham that it would be ok for Cunningham to "look around" but that he did not want to Cunningham "rummaging through my personal property."  Fife also gave Cunningham permission to make sure that the couch was clear of any weapons so that Fife and Walker could move back inside, "out of the cold."  Cunningham told Fife that he intended to "look under stuff too" to ensure that there was no weapon, to which Fife consented.

Cunningham entered and checked the couch, found no weapons, and had Fife and Walker sit on the couch (having determined that it contained no weapons).  Cunningham asked Fife if he could "look around real quick," and Fife consented.  Cunningham explained to Fife that he was

obligated to investigate Jones' allegation that Fife pulled a gun on her and that, by establishing that there was no gun in the house, he could eliminate that issue as a concern and investigate the other aspects of the incident, including Fife's claim that Jones broke his window in a burglary attempt. While Cunningham was searching, he asked Fife to recount "from beginning to end" the events that had transpired that night. Fife explained that Jones had spent the night, left the house about 30 minutes before the incident, and then came back to demand the return of "her stuff" by yelling at him and kicking the door. Fife claimed to have told Jones that he did not have her property and threatened to call the police, at which point Jones "sprang through my window" by placing her fist through it.

### 3.  Discovery of the Bag, Retraction of Consent, and Cuffing for Officer Safety

During his search of the living room, Cunningham found a pile of clothes piled up behind a piece of furniture (some type of couch or seat). Cunningham moved the clothes and found a brown briefcase-style bag underneath it on the floor, about 1.5 feet by 1.5-2 feet in size. Cunningham picked up the bag and placed it on the coffee table in front of the couch with the intention of opening of it.

At that point, Fife protested and asked Cunningham not to open the bag. Specifically, Fife asked Cunningham "not to open anything that's closed." Cunningham responded that he had to look for the weapon, "it's that simple," to which Fife responded that the briefcase had "no weapon," only "personal property." Fife admitted that it was his bag and asked Cunningham if he (Fife) could open it for Officer Cunningham. At some point in this discourse, which spanned about 15-20 seconds, Fife stood up from the couch. Cunningham told Fife that he would not allow Fife to open the bag because, if it contained a weapon, Fife could pull it out. Cunningham ordered Fife to sit back down, and Fife complied.

Fife complained to Cunningham that it was Fife who made the call to report Jones, not the other way around, stating "I know my rights." Maintaining a courteous tone, Cunningham explained that he was not attempting to violate Fife's rights and that events had transpired in Cunningham's presence that required him to investigate (referring to Jones' allegations that Fife had pulled a gun on her). At that point, Cunningham asked Fife to stand up so that he could place handcuffs on him. Cunningham cuffed Fife behind his back. Cunningham testified that he cuffed Fife to prevent him from accessing the bag – *i.e.*, in the interest of safety.

As Cunningham was cuffing Fife, Fife said something to the effect of "You can open the bag if you want," prompting Cunningham to ask for confirmation as to whether Fife was telling Cunningham that Fife was, in fact, permitting Cunningham to open the bag. Fife responded, "I don't know if I should[,]" to which Cunningham said "OK" and that he would "deal with that later" (presumably referring to accessing the bag). Fife then protested that Cunningham indicated that he would look around, but that Cunningham had not indicated that he would try to open "things." Cunningham explained that he had not opened anything. Fife told Cunningham that he would need a search warrant, to which Cunningham responded, "OK."

### 4. Discussion with Jones

Cunningham asked his backup officer, Officer Nesbitt, to step inside of the house while Cunningham went outside to speak with Jones. As he had with Fife, Cunningham asked Jones to recount "from beginning to end" what had transpired that night. Jones provided a much different account of events than Fife had.

According to Jones, Fife had grabbed her hair and thrown her out the house onto the porch, with assistance from Walker. She stated that she returned to retrieve her belongings, including her phone, and looked through the window into the house. She claimed that Fife held

a "TEC-9" gun with 32 rounds, placed it up against the window at her, and told her that he was not afraid to shoot her. She stated that, when he placed the gun "in her face," she rammed her elbow into the window in an effort to seize the gun from him. Cunningham asked Jones where Fife normally kept the weapon. Jones replied that Fife usually kept the weapon in a brown "briefcase bag" or, in the alternative, hid the gun in the woods. Jones claimed that she had a picture of the gun on her phone. Jones also indicated (through the open front door) that the brown bag that Cunningham had placed on the coffee table was the bag in which Fife kept the gun.

Cunningham asked Jones if she would like to write a statement about what had happened. She claimed that she and Fife had been boyfriend and/girlfriend for six years and started to cry. At some point before Cunningham found the guns and ammunition in Fife's apartment, Jones in fact wrote a statement concerning the incident. In the statement, Jones reiterated that Fife had thrown her out of the apartment, that he had grabbed her by the hair and dragged her onto the porch, and that he locked the door behind her. In the statement, she represented that Fife had drawn a gun on her through the window multiple times, threatened to shoot her to death, put his finger on the trigger, and looked about to pull the trigger. Jones stated that she elbowed the window and broke the glass to prevent him from shooting her.

    5. <u>Call to Headquarters and Continuing Dialogue with Fife</u>

After speaking with Jones, Cunningham called his sergeant, Sergeant Daniel Lane. According to Sergeant Lane, Cunningham reported he was investigating a domestic dispute in which a female alleged that her boyfriend had threatened her with a "TEC-9" gun. Cunningham also informed Lane that the male suspect had initially given consent to search the apartment, but

had later retracted that consent. Cunningham asked Lane to respond to the scene to start the process for obtaining a search warrant.[7]

After speaking with Cunningham, Sergeant Lane spoke with Officer Carroll in Carroll's office. Lane informed Carroll that they would likely need to obtain a search warrant and asked Carroll to accompany him to the scene to obtain more details about the situation. Carroll testified that Lane told him that he (Lane) would be bringing along a consent form, would explain both the consent process and the search warrant process, and would ask for consent. According to Carroll, it was his standard practice to ask for consent after he reported to a scene relating to a prospective "search warrant of interest." Lane and Carroll drove to Fife's residence, which was located just a few miles away.

At the suppression hearing, Lane explained that he decided to report to the scene before filling out a search warrant application in an effort to be thorough. He explained that the application required details such as a physical description of the residence and directions to the residence, and that he was ultimately responsible for reviewing and approving search warrant applications before they were submitted for judicial approval.

In the meantime, Fife continued to complain to Cunningham as to why he was being investigated. Cunningham explained to Fife that the most important part of his investigation was Jones' allegation that Fife had pulled a weapon on her. He explained that he "had to get to the

_____

[7] Sergeant Lane recalled that Cunningham indicated that they would likely need a search warrant. At the suppression hearing, Cunningham testified that he could not recall whether he made that suggestion or whether it was Sergeant Lane who made that suggestion after hearing Cunningham's recitation of the facts. For purposes of the Motion to Suppress, the operative point is that Lane and Cunningham agreed on the call that they would likely need to obtain a search warrant, and Lane went to the residence to get further information in order to seek one.

bottom of that" before addressing the dispute about the window damage and Jones' property, because the gun allegation presented a "safety issue."

Fife again stated that he had told Cunningham not to open anything, to which Cunningham responded (correctly) that he had not opened anything once Fife told him not to do so. Fife also complained that he should not "go to jail" simply because he would not let Cunningham "poke in my bag." Cunningham explained to Fife that he did not like the fact that Fife wanted to stand up and open the bag, and that he had placed Fife in handcuffs for his own safety. Cunningham reiterated that, although he understood Fife's complaint that he had reported Jones' misconduct first, subsequent events required Cunningham to investigate further. Cunningham also explained that he understood that Fife now did not want him to search any further and that "you have that right, you said you know your rights, you have that right[.]" Cunningham told Fife that, because of Jones' allegations, he would have to search the premises for a gun, either with Fife's consent or with a search warrant.

Cunningham asked Fife for his phone number and social security number, which Fife provided. Fife asked whether he had a right to bear arms, to which Officer Cunningham responded that he did. Fife complained that he had a right to protect himself when someone tried to enter his home and questioned again why he was placed in handcuffs. Officer Cunningham reiterated that he had placed Fife in handcuffs to protect himself in case the bag contained a weapon.[8]

Cunningham spoke with Jones again, who told Cunningham that Fife had owned the gun for about two weeks and that she had seen it in his possession on a daily basis. Although Fife

---

[8] Officer Nesbitt also made some less courteous comments to Fife, stating that Fife was in handcuffs because he had been "running his mouth" and not complying with the officers' instructions.

had claimed that Jones' phone was not in the house, Jones' phone was located behind the couch, and Fife allowed Cunningham to take the phone to Jones. Using the phone, Jones showed Cunningham a photo of what she claimed was Fife's gun. A few minutes later, Jones explained that Fife had let her take the gun with her once because his wife was coming over and he did not want her to find it.

      6.   <u>Discussion Between Fife and CPD Officers, and Grant of Consent</u>

At about 7:05 p.m., Sergeant Lane and Detective Carroll arrived at the scene. Cunningham discussed information he had obtained after they had spoken earlier. Cunningham told Lane and Carroll that Jones had shown him pictures on her phone of a "TEC-9" gun, albeit without a photo of the bag in which Fife allegedly kept it. Cunningham also told them that Jones was in the process of writing a statement and that the bag at issue was on the table. Cunningham stepped away and radioed for a criminal background check on Fife, Walker, and Jones, a process that took several minutes.

In the meantime, Lane and Carroll entered the house, brought Fife into the kitchen, and spoke with him. According to Lane, he and Carroll explained to Fife that they understood that he had denied consent and explained to him that Detective Carroll would be obtaining information to fill out a search warrant. Both he and Carroll testified that Fife asked them how long the process would take, to which they replied that it would take "at least a couple hours," and Fife asked him "several" additional questions relating to the search warrant. Lane recalls Fife raising an issue with Jones breaking his window. He did not recall Fife raising any issue about the bag. He could not remember if Fife asked him whether the officers would "just look around," as opposed to an "invasive" search.

With respect to his representation to Fife that it would take a few hours to obtain a search warrant, Sergeant Lane testified that he believed that time estimate to be truthful, because the application process involved obtaining information, writing it up, having a supervisor review it, making corrections (whether substantive or grammatical), driving it over to a judge available during nighttime hours, and driving back to the location to be searched. According to Lane, he told Fife that Fife had "every right to deny consent," but Fife orally granted consent to search anyway. Carroll also testified that he and Lane told Fife that he had the right to deny consent.

Lane believed that, at the time he was questioning Fife, he had a good faith basis to obtain a search warrant. Carroll also believed (and told Fife) that the officers would likely be able to obtain a search warrant. Neither Carroll nor Lane read Fife his *Miranda* rights.

Lane testified that, when Fife orally granted consent to search, Lane reviewed a consent to search form with Fife "to make sure that he completely understood everything" before he signed it. Lane believes that, per his typical practice, he likely read the form to Fife and gave it to Fife to read over himself. Fife signed the form, as did Detective Carroll as "witness" and Sergeant Lane as to the "requesting officer." He said that they had a "very calm" discussion, that none of the officers threatened to harm Fife or to destroy his property, that Fife never asked them if they would "look around" but not "poke," and that Fife never complained about being tricked in some fashion. Carroll did not recall that he or Lane asked Fife to sign the form more than one time. At some point in this discussion, they moved Fife's handcuffs to the front so that he could sign the form.

The form reads as follows:

I, [Justin Fife], have been informed by [Sgt Lane] of the Clarksville Police Department of my Constitutional Rights not to have a search made of my premises and property owned by and /or under my care, custody, and control without a Search Warrant.

15

Having those rights in mind I do now give consent to search. I willingly and freely give my permission to officers of the Clarksville Police Department. Officers may conduct a complete search of the premises and property, including all buildings, vehicles, papers and any other property both inside and outside the property located at 109 Greenland Court. The same officers have my permission to search for evidence and/or contraband for criminal prosecution of the case of [sic] cases under investigation. I understand and know what I am doing no promises of threats have been made to me and no pressure or coercion of any kind has been used against me.

(Suppression Hearing, Govt. Ex. 4.)

Cunningham testified that, after making the criminal background checks, he returned inside and overheard some of the discussion taking place in the kitchen. His recollection was generally consistent with that of Carroll and Lane: he recalls hearing Lane and Carroll reviewing the consent to search form with Fife and explaining that they could obtain a search warrant if necessary. He did not recall hearing Fife complain about being tricked or overhearing any reluctance by Fife, although he admitted that he only overheard a portion of the conversation.

### 7.   Fife's Discredited Account of Events

Fife's version of the conversation with Sergeant Lane and Detective Carroll is much different. In a testimonial affidavit, he claims that the officers deceived him and coerced him into signing the permission to search form.[9] He claims that the officers deceived him by claiming that they only wanted to search for a weapon as a "formality" and as a predicate to addressing his allegations of a home invasion by Jones. He claims that he understood the form only to authorize the officers to "have a look around" and not to authorize them to "poke into

---

[9] Fife's affidavit reads almost like a stream of consciousness recitation of events, jumping back and forth between (1) the actions of Officers Cunningham and Nesbitt *before* Sergeant Lane and Detective Carroll arrived, and (2) the actions of Sergeant Lane and Detective Carroll after they arrived and spoke with Fife in the kitchen. The court has endeavored to place the averments in the appropriate chronological order.

things." He avers that the officers repeatedly asked him what happened, questioned him without reading him his rights, and seemed intent on making him incriminate himself.[10] He claims that he would not have signed the form if he had been read his *Miranda* rights and that he did not believe that they were investigating him for potentially having committed a crime. He states that he initially refused consent twice, that he objected, and that he asked them several questions.

He claims to recall the discussion with Lane and Carroll in detail, representing that he told them twice that they "need to get a search warrant" and that he was the victim. He claims that Detective Carroll told him that, if the CPD were forced to obtain a search warrant, they would obtain the warrant and then "tear this house up and destroy it." He claims that Carroll also told him that the police had probable cause, that it would "take a couple of hours" to obtain a warrant, that Fife would "be sitting here in handcuffs for a few hours," and that by signing a consent form Fife could avoid having his residence "tore up" or "messed up." He claims that he reiterated to the officers that the search would only involve "looking around," not going through cabinets or drawers.

According to Fife, Carroll reiterated that the officers would "tear the place up" if they were required to obtain a search warrant. Fife states that, after hearing all of this, he told Carroll that he did not want to sign the form because he felt like he was being tricked. Fife purports to recall that Carroll stated (again) that he would "tear the place up and destroy it" and that Fife would remain in handcuffs if he was required to seek a warrant. Fife also claims that Lane and Carroll reassured him that, "if nothing is found, we'll focus on [Jones] and you are not going to

---

[10] It is not clear from the affidavit whether Fife is referring to Officers Cunningham and Nesbitt, to Sergeant Lane, or Detective Carroll, or both.

jail." Fife claims that the officers also refused to let him access his cell phone until he signed the form and that they would not leave unless Fife signed it.

He claims that he illustrated to them that poking in a pants pocket or "opening things" was "not what I wanted," and that they reassured him that they only intended to "look around." In other words, he claims to have given limited consent, despite the unequivocal terms of the signed consent form.

Fife's rambling account of events is not credible. The interactions between Fife and CPD officers captured on the audio recording are polite and straightforward. Nowhere on the audio does anyone threaten Fife or suggest that they intend to cause him harm or destroy his property. During the ten-minute discussion in the kitchen that was not well-captured by the audio, the audio contains laughter and no indication of yelling or threats. Furthermore, at a later point in the audio, Fife can be overheard speaking on the phone with someone, telling them that he granted consent to search because the officers would have obtained a search warrant anyway. In that call, he made no reference to threats to tear up his house, duress, coercion, or any other form of pressure as a basis for granting consent, nor did he express that the consent was limited in some fashion.

Fife's affidavit also continues to press the point that the CPD officers "tricked" him by asking for consent to search the house. The audio belies this characterization: on it, Officer Cunningham repeatedly states to Fife that he was seeking to search the house to determine whether Fife in fact had a weapon, as Jones claimed. Fife indicates multiple times on the audio that he understood Cunningham's point.

The court has also had the opportunity to evaluate the credibility of the CPD officers who testified at trial. Sergeant Lane and Detective Carroll, who were the officers most

knowledgeable about the conversation at issue, were credible witnesses. The court also credits Officer Cunningham's testimony as to what he overheard with respect to that conversation.

In sum, the court finds that Fife's testimonial affidavit is not credible and that the testimony by Sergeant Lane and Detective Carroll accurately reflects what transpired during their discussion with Fife.

8.    Opening the Bag and Searching the Rest of the House

Shortly after obtaining Fife's written consent, Officer Cunningham opened the brown bag. Inside, he found a box containing 15 rounds of 9 mm ammunition, along with a loose round inside a center pocket within the bag. Having found ammunition, the officers believed that there might also be an associated firearm in the house.

In an effort to limit the scope of his search to Fife's part of the house, Cunningham asked Fife which of the upstairs bedrooms was his, and Fife identified it. Cunningham entered the bedroom, which contained no furniture, some clothes, and a small trash bag. Cunningham saw a black object in the floor register. Before opening the register, Cunningham called another officer up to witness what he had seen and to take photographs. The audio recording reflects discussion among the officers about these photographs. The audio also captures one of the officers stating his belief that Fife is a convicted felon. Cunningham removed the floor register and found a 9 mm caliber pistol inside.

At about the same time on the audio recording, Fife can be overheard speaking with someone on his phone, stating as follows: "I had to give them f*cking consent to search the

damn house because they were going to get a search warrant anyway."  The audio does not capture Fife saying anything in that particular conversation about police coercion or threats.[11]

After recovering the firearm, Cunningham returned downstairs to speak with Walker. Cunningham asked for Walker's consent to search his bedroom, which Walker granted.  The audio contains a statement by Cunningham to another officer to the effect that he had obtained consent from Walker.  After obtaining Walker's consent, Cunningham searched Walker's room and found a long gun magazine containing ammunition for the weapon that Officer Cunningham had recovered from Fife's room.

The officers went back downstairs and formally arrested Fife.  They placed the handcuffs behind his back again and placed him under arrest for "aggravated domestic assault."  Fife protested but complied.  Fife asked again what crimes the officers were charging him with, and the officer stated that he was being charged with "aggravated domestic assault so far."  As he was being escorted to Cunningham's car, Fife stated that, if the officers found a gun, it was Jones' gun, not his.  After being booked and read his *Miranda* rights, Fife stated to Officer Cunningham that he wished that he had made the CPD obtain a search warrant.

## ANALYSIS

Although Fife primarily challenges the voluntariness of his confession, Fife asserts several arguments related to the CPD's investigation.  As Fife frames the issues, the CPD investigation can essentially be broken into several steps, which the court will address sequentially.

### I.  Initial Investigation

---

[11] On the audio, Officer Cunningham is also heard discussing other items found in the bag, including "radios and flashlights and security stuff."  Cunningham also states that "both of them" (presumably referring to Fife and Walker) "have a burglary history."

When an officer has a "reasonable, articulable suspicion" that a person has been engaged in criminal activity, the officer may conduct a further investigation, including but not limited to an investigatory detention or *Terry* stop. *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007). "Reasonable suspicion" exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity. *United States v. Gross*, 624 F.3d 309, 315 (6th Cir. 2010). Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The duration of an investigatory detention must last no longer than is necessary to dispel suspicions of criminal activity. *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). The ultimate question is whether the detention and investigative methods were reasonable under the circumstances. *Id.*

Here, Fife contends that Officer Cunningham lacked probable cause to investigate the allegation of a firearm and to request a search of Fife's home because the "tip" from Jones was unreliable and unconfirmed. Fife relies on *Florida v. J.L.*, 529 U.S. 266 (2000), in which the Supreme Court held that an anonymous report that a person was carrying a gun was, without more, insufficient to justify a police officer's stop and frisk of that person.

Fife is comparing apples and oranges. This case does not involve a "tip" (anonymous or otherwise) that Fife had a gun. Instead, it was *Fife* who initially called the police to respond, asserting that someone was attempting to break into his home. Cunningham did not begin investigating whether Fife had committed a crime based on Fife's own phone call, as Fife did not incriminate himself in the 911 call. Instead, it was information that Officer Cunningham learned from Jones *after* responding – namely, the allegations made by Jones directly to Officer

Cunningham when he questioned her at the scene– that gave him reasonable suspicion to believe that Fife possessed a gun and may have used it to commit an aggravated assault on Jones. Unlike a "tip" from an unknown informant, Officer Cunningham had established Jones' and Fife's identities and was able to assess their respective credibility in real time.

In light of these facts, Officer Cunningham was entitled to pat down Jones for a weapon in the interest of officer safety (which he was entitled to do anyway),[12] and he was also entitled to investigate whether Fife had in fact committed a domestic assault on Jones using a gun, as she was claiming. In other words, once Officer Cunningham had a reasonable suspicion that Fife had committed an aggravated assault on Jones, the Constitution did not constrain him to conducting a pat down of Fife for his own safety; it also permitted him to contain questioning Fife and to detain him long enough to dispel the possibility that Fife had engaged in criminal activity.

Fife takes a different view: he contends that Officer Cunningham was obligated to cease his investigation because (1) Fife did not have a weapon on his person during the pat-down search, (2) Fife denied Jones' allegations, (3) Walker claimed not to have seen Fife commit an assault or possess a weapon, and (4) (according to Fife's briefing) Jones was "a woman obviously high and unafraid and angry who broke a window while admittedly attempting to invade a home." (Docket No. 52 at p. 1.) Officer Cunningham was not constitutionally obligated to accept Fife's denials and to draw adverse conclusions about Jones' credibility and about her account of events. Indeed, Fife could have been lying, Walker could have been lying or was simply unaware of what Fife had done, and the weapon could have been located somewhere else (such as inside the house). From Officer Cunningham's perspective, Jones'

---

[12] Fife conceded this point at oral argument.

agitation could have reflected the fact that Fife had actually drawn a gun on her and threatened to shoot.

At any rate, at that point, Officer Cunningham did not need to *know* that Fife had actually committed a crime or conclude that he *likely* had committed a crime; he just needed to have a reasonable suspicion that Fife had committed a crime to continue his investigation. The statements by Jones were sufficient to give Officer Cunningham reasonable suspicion to believe that Fife had assaulted Jones with a gun, with or without additional corroborating information. In sum, it was not unconstitutional for Officer Cunningham to continue to investigate whether Fife had committed a domestic assault on Jones.

## II. <u>Discussion With Walker</u>

Officer Cunningham orally received Fife's consent to speak with his roommate, Walker. Officer Cunningham asked for consent from Walker to enter the house to speak with him, and Walker orally gave consent. Although Walker claimed that he had no knowledge that Fife possessed a gun or that there was a gun in the house, he did admit that Fife had "hurdled" (meaning "herded") Jones out of the house during their recent altercation. Fife does not contest that Officer Cunningham validly obtained consent to speak to Walker and to enter the house to speak to Walker, as reflected in the audio.

## III. <u>Moving Out of the House and Back In</u>

After Officer Cunningham asked Fife to step inside the house while he spoke with Walker, Cunningham asked Fife if he could search for weapons, to which Fife responded that he would not let Cunningham do so without a search warrant. Cunningham said "OK" and immediately walked back outside with Fife and Walker.

After stepping outside, Fife changed his mind and told Officer Cunningham that he could "look around" as long as he did not "rummage" through Fife's personal property. Fife also gave Cunningham permission to make sure that the couch was clear of any weapons so that Fife and Walker could move back inside, "out of the cold." After receiving these forms of consent, Cunningham in fact checked the couch for weapons and moved inside with both Walker and Fife, who sat on the couch. Fife does not contend that any of these actions independently amounted to a constitutional violation.

## IV. <u>Limited Consensual Search and Associated Detention</u>

Fife admits, as he must, that he voluntarily gave Officer Cunningham limited consent to search his residence once they got inside. (*See, e.g.*, Docket No. 18 at p. 5 (characterizing the search as a "limited consensual search").) Indeed, after entering the house, Cunningham again asked whether Fife would consent to a search of the area and Fife again consented. Cunningham explained his logic to Fife: if Cunningham found no weapon, it would indicate that Fife had not actually drawn a weapon on Jones, which Officer Cunningham understandably believed was the more pressing of Fife's and Jones' cross-cutting allegations.

Fife also suggests that Cunningham placed him in handcuffs without cause, which Fife believes was part of a campaign to wear Fife down and coerce him into consenting to a full search of his house. The record supports the government's contention that Officer Cunningham justifiably placed Fife in handcuffs in the interest of officer safety. Cunningham initially directed both Fife and Walker to sit on the couch while he looked around the room. For approximately three minutes, Fife engaged in a long explanation to Officer Cunningham of what had transpired with Jones. After Cunningham found the bag, Fife asked Cunningham not to open it, protested that he did not want Cunningham to open anything of his that was closed,

offered to open it himself, and stood up as if to move towards the bag to open it. At that point, Fife's conduct aroused Cunningham's suspicion that Fife may have been moving towards the bag because it contained a weapon, and Cunningham at that point reasonably believed that Fife should be handcuffed in the interest of officer safety. Cunningham's actions were quite routine: he simply handcuffed Fife behind his back and directed Fife to remain on the couch. Moreover, another fact lends credence to Cunningham's testimony that he handcuffed Fife in the interest of his own safety: it does not appear that Cunningham handcuffed Walker, who, unlike Fife, did not stand up from the couch and did not otherwise offer or attempt to open the bag.

In sum, the court finds that the record shows that Cunningham handcuffed Fife in the interest of officer safety, not to punish Fife for refusing to let him open the bag or to coerce Fife into granting him consent to search the bag.

## V. **Voluntariness of Fife's Consent from the Point of Handcuffing Forward**

### A. **Legal Standard**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998) (quoting U.S. Const. amend. IV, § 2). Thus, as a general matter, warrantless searches and searches not supported by probable cause are constitutionally unreasonable, except in certain "jealously and carefully drawn" circumstances. *United States v. Worley*, 193 F.3d 380, 385-86 (6th Cir. 1999) (citing *United States v. Watson*, 423 U.S. 411, 427, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976)); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) ("[A] search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions.") (internal ellipsis omitted). One of

those exceptional circumstances, asserted by the government here, is that the search was conducted pursuant to voluntary and valid consent. *Worley*, 193 F.3d at 386; *Schneckloth*, 412 U.S. at 219; *United States v. Beauchamp*, 659 F.3d 560, 571-572 (6th Cir. 2011); *Bumper v. N. Car.*, 391 U.S. 543, 548, 88 S. Ct. 1788, 1792, 20 L. Ed. 2d 797 (1968).

"Because the government often asserts that a defendant consented in cases 'where the police have some evidence of illicit activity, but lack probable cause to arrest or search,' . . . we carefully examine the government's claim that a defendant consented." *Worley*, 193 F.3d at 386 (quoting *Schneckloth*, 412 U.S. at 227). In analyzing whether the government has obtained consent, "[t]he government bears the burden of demonstrating by a preponderance of the evidence, through *clear and positive testimony*, that [the defendant's] valid and voluntary consent to the search was obtained." *Worley*, 193 F.3d at 386 (emphasis added). The defendant's consent to the search must have been "unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion." *Worley*, 193 F.3d at 386; *Beauchamp*, 659 F.3d at 571. Whether the alleged consent meets this standard "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *Worley*, 193 F.3d at 386. Thus, "there is no 'magic' formula or equation that a court must apply in all cases to determine whether consent was validly and voluntarily given." *Worley*, 193 F.3d at 386. The court may make credibility determinations in resolving the issue. *Ivy*, 165 F.3d at 401-402.

In analyzing whether consent was valid, "the court should examine, *inter alia*, the following factors: the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Worley*, 193 F.3d at 386. The absence of an overt act or threat of force,

promises made to a defendant, or indications of "more subtle forms of coercion" that might flaw a defendant's judgment indicate that a defendant's consent was freely given. *Ivy*, 165 F.3d at 402 (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994); *Morphis v. United States*, 110 F. App'x 527, 530 (2004). When a defendant argues that police tactics were coercive, "the defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police." *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995).

Also, "a search based on consent requires more than the mere expression of approval to the search." *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981), *overruled on other grounds by Steagald v. United States*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981). That is, the alleged statement of consent must be "an unequivocal statement of free and voluntary consent, not merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *Worley*, 193 F.3d at 386; *Jones*, 641 F.2d at 429.

With respect to consent given by a person in custody or otherwise detained, "[t]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *Watson*, 423 U.S. at 424. Also, a statement by a law enforcement officer that he will obtain a warrant if the suspect does not consent is permissible, provided that the statement is not "baseless" or a "pretext" to coerce the defendant. *See United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998); *United States v. Bond*, 433 F. App'x 441, 445 (6th Cir. 2011); *Morphis*, 110 F. App'x at 530.

### B. Application

The relevant factors support a finding that Fife voluntarily consented to the search of his apartment.

1. <u>Alleged Coercion & Associated Length of Detention</u>

Fife principally argues that the officers coerced him into granting consent.

First, although Fife makes much of the fact that he was handcuffed when he consented, the record demonstrates that he was cuffed for a legitimate safety purpose (given his behavior with respect to the bag), rather than to punish him for refusing consent or to abuse him in some fashion. *See Houston v. Clark Cnty. Sheriff Deputy John Does*, 174 F.3d 809, 815 (6th Cir. 1999) (finding that the use of handcuffs does not exceed the bounds of a *Terry* stop, so along as the circumstances warrant that precaution).

Although he remained cuffed for 30-40 minutes before signing the consent form, the length of that detention was reasonable and warranted. "When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate." 174 F.3d at 815. Thus, in *Houston*, where an officer's "inquiries and safety precautions were reasonably related to the initial basis" for the detention, the Sixth Circuit held that a stop of 35 minutes to an hour was warranted. *Id.*; *see also United States v. Thomas*, 2009 WL 2971781, at *4 (W.D. Tenn. July 20, 2009) (finding that suspect who signed consent to search form did so voluntarily, where subject had been cuffed in the back of a police cruiser for at least 15-20 minutes); *United States v. McIntyre*, 2008 WL 2634377, at *4 (N.D. Ohio June 27, 2008) (finding that detention of 1 hour and 40 minutes was not coercive). Here, after cuffing Fife, Cunningham spoke with Jones for approximately five or six minutes to gather additional details and to ask her for a written statement, after which he spent approximately ten minutes outside communicating with the CPD station. Cunningham returned inside to speak with Fife, and Sergeant Lane and Officer Carroll arrived about 15 minutes thereafter. Cunningham justifiably

kept Fife in restraints during this time frame, the time he spent gathering additional information from Jones was reasonable, and Lane and Carroll responded to the scene as soon as practicable.

Furthermore, by the time Sergeant Lane and Officer Carroll arrived, the CPD officers had both oral and written accounts from Jones that Fife had drawn a gun on her that night, she had shown pictures of a gun to law enforcement, and she had indicated that Fife often (but not always) kept the gun in the brown bag that was sitting on the coffee table. In light of these facts, it was reasonable for the officers to continue to keep Fife restrained for safety purposes while they spoke with him, to prevent him from roaming the house and accessing a gun. Furthermore, the circumstances of Fife's detention were not oppressive: he was detained in his home (rather than in a police station or other potentially coercive environment), the officers let him use his cell phone while he was detained, the officers had a running polite dialogue with Fife, and at times laughing could be heard.

The record does not support an inference that the officers repeatedly asked Fife for consent to search in an effort to show that his refusal to acquiesce was futile, as Fife claims. Officer Cunningham asked for, and received, consent multiple times almost every step of the way, including the pat down of Fife, the initial discussion with Walker, his initial entrance into the house, his request to search the living room, his request to search the house, *etc*. Officer Cunningham was being diligent and courteous, not coercive. Furthermore, Fife's actions at the time demonstrated that he did not (and should not have) understood resistance to the search requests to be futile. At multiple points, Fife stated that he would not permit a search without a warrant, and in each instance Cunningham complied by stopping the search. For example, Fife granted limited consent, then retracted it, and Cunningham complied. Finally, some of the search requests essentially were prompted by comments from Fife, such as Fife initially blurting

out (while being cuffed) that Cunningham could search the bag, a statement that Fife retracted when Cunningham sought to confirm it.

As to their discussions with Fife, Sergeant Lane and Officer Carroll did not physically or verbally abuse Fife, nor did they threaten Fife or his property for refusing to consent. Instead, they explained his rights to him and truthfully explained that they would obtain a warrant if he refused to consent. By that point, they had a good faith basis to make that statement, which was accurate and truthful. *See Salvo*, 133 F.3d at 954. Furthermore, the record does not substantiate Fife's claim that Sergeant Lane and Officer Carroll drove to Fife's residence specifically to coerce him into consenting to a search. Lane and Carroll had legitimate reasons to arrive at the scene before completing a warrant application, including their need to gather more information and for Lane to ensure the completeness and veracity of the information that would be included in the application. The fact that they brought a consent form with them is not indicative of coercion or a preconceived plot; instead, it reflected the possibility that Fife might consent to the search (as he ultimately did), thereby avoiding the time-consuming process of obtaining a warrant, which was inevitable by that point.

Finally, the court gives no credence to Fife's claim that the officers "tricked" him into granting full consent to search, when in fact he had only authorized them to "look around." The Permission to Search Form contains plain language authorizing a full search. In a non-coercive environment, Fife signed the form, which contained none of the limitations that Fife now claims. Fife did not complain about the scope of the search thereafter, including opening the bag. In fact, Fife expressed to someone on the phone that he "had to give" the police "consent to search the damn house because they were going to get a search warrant anyway." He did not indicate that he had given only limited consent or that he had been coerced into granting full consent.

## 2. Other Factors

At the time of the incident, Fife was 29 years old, an age at which he was sufficiently competent to make his own decisions. Fife also received a GED and had enrolled in college, demonstrating sufficient intellectual capacity to understand and appreciate his constitutional rights, notwithstanding the fact that he flunked out of college. Fife also has ample experience with law enforcement, including his numerous arrests and felony convictions, giving him more exposure than most people to the constitutional rights that attach to criminal investigations and other criminal proceedings.

Moreover, as discussed in the previous section, the record contains ample evidence that Fife in fact appreciated his constitutional right to refuse consent. Indeed, at multiple points, he stated that he would not let the search proceed without a search warrant, demonstrating his appreciation that a search warrant was required. Fife also signed a Permission to Search form in which he acknowledged, in writing, that he had been informed of his constitutional right not to have a search made of his house and property without a warrant, and that he knowingly waived that right in favor of granting voluntary consent to the search.

In sum, all of the relevant factors favor the conclusion that Fife voluntarily consented to the search of his home.

## VI. Lack of *Miranda* Warning

Fife also contends that the United States Constitution entitled him to receive a *Miranda* warning before consenting to a search. He acknowledges that no court has held that *Miranda* warnings apply in this context, but he claims that the protection against self-incrimination should apply equally in the Fourth Amendment context as it does in the context of a custodial interrogation.

Every circuit to have addressed this issue, including the Sixth Circuit in unpublished opinions, has held that *Miranda* warnings do not apply to a request for consent to search because (1) a request for consent to search is not a custodial interrogation, which is a requirement for Fifth Amendment protection, and (2) a request for consent to search generally does not elicit an "incriminating" response because the consent is not *itself* evidence that is testimonial or communicative in nature. *See United States v. Kellogg*, 202 F. App'x 96, 103 (6th Cir. 2006); *United States v. Cooney*, 26 F. App'x 513, 523 (6th Cir. 2002); *see also Schmerber v. California*, 384 U.S. 757, 760-61 (1966) ("The protections of the Fifth Amendment only apply to incriminating evidence of a testimonial or communicative nature."); *United States v. Glenna*, 878 F.3d 967, 971 (7th Cir. 1989); *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996); *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994). Here, in light of this persuasive authority, the court finds no reason to break new ground.

One final point: Fife argues that it was unlawful for the police to ask him to identify his own bedroom after the police recovered ammunition in the brown bag. The record shows that the police asked this question in an effort to limit the scope of their search to Fife's bedroom (rather than Walker's), reflecting diligence by the police to confine their search appropriately. To the extent Fife contends that it was unlawful for the police to ask him this question without giving him his *Miranda* rights, the argument fails for the reasons stated in the previous paragraph, namely that the statement itself was not incriminating and was not part of a custodial interrogation.

**CONCLUSION**

For the reasons stated herein, the Motion to Suppress and the Amended Motion to Suppress will be denied. The Motion to Strike (Docket No. 43) will be denied for the reasons stated by the court at the suppression hearing.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge